UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

InterRad Medical, Inc.,                          File No. 23-cv-3709 (ECT/DTS)

       Plaintiff,

v.                                               **OPINION AND ORDER**

Aquilant Limited,

       Defendant.

---

Brent A. Lorentz and Michael Anthony Gale-Butto, Winthrop & Weinstine, P.A., Minneapolis, MN, for Plaintiff InterRad Medical, Inc.

Rocco Eugene Testani and Tracey K. Ledbetter, Eversheds Sutherland (US) LLP, Atlanta, GA, and David L. Hashmall, Felhaber Larson, Minneapolis, MN, for Defendant Aquilant Limited.

---

Plaintiff InterRad Medical, Inc., a medical device company, brought this case against its former exclusive distributor in the United Kingdom, Defendant Aquilant Limited, claiming that Aquilant is violating its post-termination contractual obligations by, among other things, selling its remaining inventory of InterRad product. InterRad seeks a preliminary injunction requiring Aquilant to comply with InterRad's understanding of Aquilant's post-termination contractual obligations.

InterRad's motion will be denied for two primary reasons. First, though the question is fairly debatable, InterRad has not demonstrated that its distribution agreement with Aquilant prohibits Aquilant from selling its remaining inventory. For this reason, InterRad has not shown it is likely to prevail on the merits of its main breach-of-contract claim.

Second, InterRad has not demonstrated it is likely to suffer irreparable harm absent an injunction. Lost business can be compensated by monetary damages. And a likelihood of harm to InterRad's reputation and goodwill must be shown by more substantial proof than has been provided here.

I

*InterRad supplies SecurAcath, a medical device.* InterRad "is a medical device company located in Plymouth, Minnesota." ECF No. 27 ¶ 2. InterRad's "most successful commercial product is the SecurAcath," a device that "can hold percutaneous catheters securely in place without sutures or adhesives." *Id.* InterRad is the sole supplier of SecurAcath, and SecurAcath historically comprised all of InterRad's revenue. *Id.* ¶ 3. England, Scotland, and Wales, collectively, is InterRad's most important market. *Id.*

*Aquilant becomes InterRad's exclusive distributor in England, Scotland, and Wales.* Organized in the United Kingdom, Aquilant is a "medical device distributor offering sales, marketing, and technical services" for manufacturers. ECF No. 36 ¶ 2. In August 2016, Aquilant entered into a distribution agreement with InterRad. ECF No. 36 ¶ 4; ECF No. 27 ¶ 9. The distribution agreement made Aquilant InterRad's exclusive distributor in England and Wales. ECF No. 36 ¶ 4. When the August 2016 distribution agreement expired in October 2019, the parties entered into a second distribution agreement, adding Scotland to Aquilant's exclusive territory. *Id.*

*The Aquilant/InterRad distribution agreements include minimum-purchase requirements referred to as "forecasts."* Under the 2016 and 2019 distribution agreements, the parties agreed to "forecasts of annual purchases by Aquilant from

2

InterRad." ECF No. 36 ¶ 6. For example, the annual forecast was 5,000 boxes in 2017, but rose to 14,919 boxes in 2020. *Id.* The parties describe the forecasts as minimum-purchase requirements, *see* ECF No. 27 ¶¶ 9–10; ECF No. 31 at 15, meaning, in other words, Aquilant agreed to purchase at least 5,000 boxes of SecurAcath in 2017 and at least 14,919 boxes of SecurAcath in 2020.

*Aquilant sells less SecurAcath than anticipated, resulting in an inventory surplus.* At some point, Aquilant's sales lagged behind the agreed-upon purchasing forecasts. *See* ECF No. 36 ¶ 8. Aquilant offers several explanations for this, including the COVID-19 pandemic, ECF No. 38 ¶ 6, market saturation, *id.* ¶ 4, risks associated with incorrectly using SecurAcath, ECF No. 39 ¶ 4–5, and a limited range of product sizes, *id.* ¶ 6. InterRad, on the other hand, claims "Aquilant chose to run-up its stored inventory of InterRad's products significantly beyond what it was then selling." ECF No. 27 ¶ 14. Regardless, Aquilant sold substantially less SecurAcath than it purchased. ECF No. 36 ¶¶ 6, 8–9. The result was an inventory surplus. *Id.* ¶ 9. It seems Aquilant first informed InterRad about this inventory surplus problem in late 2020. ECF No. 33 ¶ 2.[1] In 2021, Aquilant provided InterRad with an analysis of the inventory issue, predicting that it would continue past 2024. ECF No. 36 ¶ 9. In January 2021, Aquilant was holding "over 12,000 units of InterRad stock," nearly a year's worth of inventory. ECF No. 33 ¶ 3. In late 2021, the

---

[1] The Chief Executive Officer of InterRad, Joe Goldberger, states, "InterRad was unaware of any significant issues with Aquilant's excessive inventory until 2021, when Aquilant first communicated to InterRad that much of its then existing inventory was either expired or nearing expiration." ECF No. 27 ¶ 15. However, there was at least some discussion of Aquilant's inventory problem in late 2020. *See* ECF No. 33-1 at 2–4.

parties agreed to "rework 7,000 boxes of expired or expiring inventory" to extend the shelf-life and expiration date of the InterRad products. ECF No. 27 ¶ 15; ECF No. 36 ¶ 10. But this did not solve Aquilant's underlying inventory problem as sales continued to lag behind the annual forecasts. *See* ECF No. 33 ¶¶ 3–4. By February 2022, the inventory surplus had grown to roughly 19,000 units of InterRad stock. *Id.* ¶ 4.

*The parties execute a third distribution agreement in 2022.* Because the 2019 distribution agreement expired in October 2022, the parties negotiated a third distribution agreement in 2022 (the operative "Agreement"). Aquilant forecasted that it would need to order 8,150 boxes of SecurAcath per year. ECF No. 36 ¶ 11. This was considerably below the 2021 annual forecast of 15,916 boxes, and the parties compromised on a forecast of 11,000 boxes for 2023 and 10,000 boxes for 2024. *Id.* Exhibit D to the Agreement set monthly forecasts for 2023 and 2024 instead of annual ones. ECF No. 27-1 at 14. The 2023 forecast was 917 boxes each month for 12 months, while the 2024 forecast was 834 boxes each month for 12 months. *Id.*

*Aquilant stops placing new orders of SecurAcath and cancels pending orders.* Aquilant did not place a monthly order for January 2023, ECF No. 27 ¶ 17, and in early February canceled orders placed for October, November, and December 2022, *id.* ¶ 18.[2] On February 14, 2023, "InterRad informed Aquilant that it would terminate the

---

[2]    Because of supply-chain problems, Aquilant's orders for InterRad product experienced delays. ECF No. 36 ¶ 12. "During the summer and fall of 2022, InterRad fulfilled orders approximately three months after they were placed, and by the summer of 2023, InterRad was shipping orders 6 months after they were placed." *Id.* This meant when Aquilant cancelled orders from previous months, those orders were not necessarily shipped or delivered.

[Agreement]," unless Aquilant reinstated the canceled orders and placed orders for January and February. *Id*. ¶ 19. Aquilant agreed to reinstate the canceled orders, *id*. ¶ 20, but requested further reductions to its minimum-purchase requirements. *See, e.g.*, ECF No. 35 at 5–6. Increasingly concerned with the size of its inventory surplus, Aquilant warned InterRad in February that "the current stock holding risk is unacceptable to both businesses." *Id*. at 4. But the parties could not reach an agreement to reduce the forecasts. *Id.*; ECF No. 28-5. In June, Aquilant renewed its request for a modification to the 2022 distribution agreement, proposing a lower minimum order quantity of "7000 units a year increasing by 5% annually for the next 5 years." ECF No. 28-5 at 5. Again, the parties failed to reach an agreement. *Id.* at 2–5.

*InterRad terminates the Agreement.* In July, Aquilant "suspended" all pending orders placed after December 2022. ECF No. 27 ¶ 22; ECF No. 36 ¶ 13. Moreover, Aquilant did not place SecurAcath orders for July or August. ECF No. 27 ¶ 25. On August 18, 2023, InterRad sent a notice of termination to Aquilant. ECF No. 27-4. The letter stated that termination of the Agreement "shall be effective September 17, 2023, at which time InterRad will transition to a new distributor." *Id.*

*InterRad appoints a new distributor, Vygon.* At some point in 2023, InterRad selected Vygon to succeed Aquilant as its exclusive distributor for Scotland, England, and Wales. ECF No. 27 ¶ 24; ECF No. 36 ¶ 16. In the August 18, 2023 termination letter, InterRad instructed Aquilant to assist with the transition to Vygon. ECF No. 27-4. Aquilant initially agreed to "hand the business over to Vygon in the best possible fashion," but warned "we have a substantial stock holding which needs to be dealt with as a priority."

ECF No. 28-6 at 3.  With years' worth of inventory, Aquilant stated, "if no arrangements for the stock were made, Aquilant would need to sell its inventory into the market to avoid a total loss."  ECF No. 36 ¶ 15.  A few weeks later on September 1, Aquilant disputed the validity of InterRad's termination, contending the forecast requirements in Exhibit D were annual, not monthly, and offered to mutually terminate the Agreement so long as the parties could agree on "an equitable disposition for the stock currently held by Aquilant."  ECF No. 28-7.

*Aquilant attempts to sell its remaining inventory in bulk to the NHS Supply Chain.* The National Health Service Supply Chain is a centralized purchasing platform and one of the largest purchasers of SecurAcath in England, Scotland, and Wales.  ECF No. 27 ¶¶ 3, 35.  In September 2023, Aquilant attempted to negotiate a bulk sale of Aquilant's SecurAcath inventory to the NHS Supply Chain.  ECF No. 37 ¶ 2.  The NHS Supply Chain had received "CEO approval for the deal, as of 18 September 2023."  *Id.*  However, "on 21 September 2023, NHS Supply Chain informed [Aquilant] in a phone call that InterRad's Joe Goldberger . . . threatened action against them if they purchased any products from Aquilant."  *Id.* ¶ 3.  The deal fell through, leaving Aquilant with "19,000 units of SecurAcath product."  *Id.*

*The NHS Supply Chain stops purchasing SecurAcath.*  Around the same time Aquilant was attempting to negotiate a bulk sale of its inventory, Vygon reached out to the NHS Supply Chain to "initiate the process of transferring the supply arrangement from Aquilant to Vygon."  ECF No. 36 ¶ 16; ECF No. 36-2.  In response, Aquilant sent a cease-and-desist letter to Vygon.  ECF No. 27 ¶ 31.  The NHS Supply Chain recognized that

Vygon, not Aquilant, was now InterRad's authorized distributor, but explained that a novation was required for Vygon to replace Aquilant as NHS Supply Chain's supplier of SecurAcath. ECF No. 28-9 at 5. Aquilant does not appear to have agreed to a novation. *See* ECF No. 27 ¶ 36. Without an agreement, the NHS Supply Chain discontinued purchases and sales of SecurAcath. ECF No. 27 ¶ 38.

*Aquilant contacts an InterRad board member directly.* On September 4, 2023, Aquilant reached out directly to an InterRad board member over LinkedIn. ECF No. 27-5. Aquilant warned: "Unfortunately we are in a position now where we will now sell 3 years of stock into the market before termination," explaining that "all that will happen is the customers will get a very good deal on stock and no one will be there to service or grow the market while the stock washes out." *Id.* On September 14, 2023, InterRad sent a second termination letter "exercising its contractual right to terminate the agreement **effective immediately**." ECF No. 27-6 at 3. Aquilant continued to sell SecurAcath. ECF No. 38 ¶ 12; ECF No. 27-7.

*InterRad's Claims.* InterRad filed its original Complaint on December 1, 2023. Compl. [ECF No. 1]. InterRad filed the operative four-count Amended Complaint on February 15, 2024. Am. Compl [ECF No. 44]. Count I is for declaratory judgment. *Id.* ¶¶ 69–75. Count II is for breach of contract. *Id.* ¶¶ 76–85. Count III is for breach of the implied covenant of good faith and fair dealing. *Id.* ¶¶ 86–89. Count IV is for tortious interference with contract or prospective economic advantage. *Id.* ¶¶ 90–98. InterRad seeks damages, injunctive relief, punitive damages, and attorneys' fees. *Id.* at 22 (prayer for relief).

II

There is a preliminary matter to address regarding subject-matter jurisdiction. InterRad filed this lawsuit alleging federal jurisdiction based on diversity of citizenship. Compl. ¶¶ 7–8. But InterRad "failed to properly plead the corporate structure and citizenship of [Aquilant]." ECF No. 41 at 1. For this reason, Magistrate Judge Schultz ordered InterRad to file an Amended Complaint "pleading the corporate structure of [Aquilant's] business and the necessary indicia of citizenship." *Id.* at 2. InterRad filed its Amended Complaint on February 15, 2024, in response to Judge Schultz's order. *See* Am. Compl. Because courts must consider subject-matter jurisdiction *sua sponte*, *see, e.g.*, *Fort Bend Cnty. v. Davis*, 587 U.S. ----, 139 S. Ct. 1843, 1849 (2019), it is necessary to decide whether InterRad's Amended Complaint adequately pleads Aquilant's corporate structure and citizenship.

District courts have jurisdiction of civil actions where the matter in controversy exceeds $75,000 and the citizens are diverse. 28 U.S.C. § 1332(a). The citizenship of a corporation depends on its principal place of business and place of incorporation. 28 U.S.C. § 1332(c)(1). A non-corporate entity's citizenship, such as a limited liability company, is the citizenship of each of its members. *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). Deciding whether a foreign entity should be treated as a corporation under § 1332 can be difficult. *Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 932 F.3d 1102, 1105 (8th Cir. 2019) (adopting the approach employed by the Seventh Circuit for determining the citizenship of foreign entities). "To account for linguistic and other differences between domestic and foreign business laws and the fact that other

nations do not necessarily call entities that are in effect corporations by that name, a court examines whether the foreign entity is 'equivalent in all legally material respects to a corporation under state law.'" *Id.* (quoting *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003)).  A foreign legal entity will be treated as a corporation if it has "'the standard elements of personhood (perpetual existence, the right to contract and do business in its own name, and the right to sue and be sued),' as well as the ability to 'issue[] shares to investors who enjoy limited liability' and which 'can be bought and sold, subject to restrictions that the business declares.'" *Id.* (quoting *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 791 (7th Cir. 2014)).

With the standard in mind, InterRad alleges Aquilant "is a private company limited by shares," that "is domiciled, incorporated, and registered in the United Kingdom."  Am. Compl. ¶¶ 6, 8 (describing Aquilant as a "United Kingdom limited company").  This description, though sparse, is enough to plausibly show that Aquilant is a United Kingdom private limited company.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (recognizing that subject-matter jurisdiction "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation").  And a United Kingdom private limited company has all of the features of an American corporation: "separate legal identity with separate liability; at least one director and one secretary; marketable stocks, though they cannot be sold on the public exchange; required annual reports to the Companies House, the United Kingdom's equivalent of a State Corporation Commission; and no pass-through taxation."  *Brink's Co. v. Chubb Eur. Grp. Ltd.*,

No. 3:20-CV-520-HEH, 2020 WL 6829870, at *6 (E.D. Va. Nov. 20, 2020); *SNC-Lavalin Constructors Inc. v. Tokio Marine Kiln Ins. Ltd.*, Nos. GJH-19-873, GJH-19-1510, 2021 WL 2550505, at *6 (D. Md. June 21, 2021) (same); *Green Coast Enters., LLC v. Certain Underwriters at Lloyd's*, No. 22-973, 2022 WL 2208206, at *4–5 (E.D. La. June 21, 2022) (same). Because of these similarities, courts agree that a United Kingdom private limited company "is an analog to an American corporation." *Brink's*, 2020 WL 6829870, at *5 (collecting cases). Therefore, Aquilant's place of citizenship is determined by its place of incorporation and principal place of business. *See* 28 U.S.C. § 1332(c)(1).

Because InterRad alleges Aquilant is incorporated in the United Kingdom with its principal place of business in Basingstoke, England, Am. Compl. ¶ 6, it adequately pleads that Aquilant is a citizen of the United Kingdom for purposes of diversity jurisdiction. And because InterRad is a citizen of Delaware and Minnesota, *id.* ¶ 5 (alleging that InterRad is a Delaware corporation with its principal place of business in Plymouth, Minnesota), the parties are completely diverse. The allegations in the Amended Complaint plainly satisfy the $75,000 amount-in-controversy requirement. *Id.* ¶ 8.

## III

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "In deciding whether to issue a preliminary injunction, the district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and

(4) the public interest.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

## A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted); *Sleep No. Corp.*, 33 F.4th at 1016. Although this factor uses the term "probability," the movant ordinarily need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807. And the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts in its complaint." *Id.* (citation omitted). "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) (citation omitted).

InterRad seeks an injunction to enforce what it says are Aquilant's post-termination obligations, alleging Aquilant has breached, and is continuing to breach, § 19(a) of the Agreement. Under Minnesota law, which the parties agree applies here, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4)

damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted).  "[T]he primary goal of contract interpretation is to determine and enforce the intent of the parties." *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003).  When contract language is unambiguous, the "language must be given its plain and ordinary meaning." *Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 704 (Minn. 1999) (footnotes omitted).  A contract is ambiguous only when its terms "are susceptible to more than one reasonable interpretation." *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).  "The determination of whether a contract is ambiguous is a question of law, but the interpretation of an ambiguous contract is a question of fact for the jury." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (citations omitted).

1

The parties do not dispute the Agreement's validity; their first dispute centers on the second element—the performance of any conditions precedent.  Because Aquilant's contractual obligations in § 19(a) are conditioned "[u]pon the termination of this Agreement for any reason," ECF No. 28 § 19(a), the Agreement's termination is a condition precedent to Aquilant's post-termination obligations, *see Capistrant v. Lifetouch Nat'l Sch. Studios, Inc.*, 916 N.W.2d 23, 27 (Minn. 2018) ("[A] condition precedent is a fact that must occur before the promisor is obligated to perform.") (citation omitted).  The parties dispute whether InterRad properly terminated the Agreement, triggering Aquilant's post-termination obligations.

The Agreement "may be terminated immediately upon the occurrence of the following . . . (viii) failure to meet or exceed forecast (Exhibit D)." ECF No. 28 § 19. Exhibit D to the Agreement forecasts 11,000 boxes for 2023, with a line stating "917 boxes each month for 12 months." ECF No. 28 at 13. Aquilant agrees that the forecasts attached as exhibits to the distribution agreements required it to purchase minimum amounts of SecurAcath. *See, e.g.*, ECF No. 31 at 15 ("That [distribution] agreement established a forecast that Aquilant would purchase 14,919 boxes of InterRad product in 2020, with later years' minimums to be reviewed annually. In 2021, the minimum was increased to approximately 15,900 boxes per year." (citation omitted)). The plain meaning of "917 boxes each month for 12 months" is that Exhibit D's minimum-purchase requirement was monthly for 2023. Because Aquilant did not place a monthly order for July or August 2023, and suspended all earlier pending orders for 2023, ECF No. 27 ¶¶ 22, 25, it is fair to conclude that Aquilant failed to meet or exceed the forecast contained in Exhibit D. In response, InterRad exercised its right to terminate the Agreement on September 14, 2023. ECF No. 27 ¶ 32. Therefore, InterRad will likely be able to show that the Agreement was terminated on September 14, 2023, triggering Aquilant's post-termination obligations.[3]

2

The third element of InterRad's breach-of-contract claim concerns whether Aquilant materially breached its post-termination obligations. Because InterRad claims that

---

[3] Because InterRad appears to have properly terminated the Agreement, there is no need to reach the parties' repudiation arguments.

Aquilant "has breached" and "is continuing to violate" several of its post-termination obligations, ECF No. 25 at 22, each alleged breach will be addressed in turn.

(a) InterRad's main concern is Aquilant's "ongoing sales in violation of the contractual terms." ECF No. 25 at 21. For this reason, it seeks an injunction ordering Aquilant to cease selling SecurAcath. *See* ECF No. 30 at 8 ¶ 4. Although Aquilant admits it has continued to sell SecurAcath, ECF No. 31 at 40 (discussing "the SecurAcath products being sold by Aquilant today"), it is necessary to examine whether the Agreement prohibits Aquilant from selling its remaining inventory after the Agreement is terminated.

Start with the language of § 19(a):

> Upon the termination of this Agreement for any reason: (i) [Aquilant] shall return to [InterRad], within ten (10) days from the effective date of the termination of this Agreement, all Confidential Information and all materials given to [Aquilant] by or on behalf of [InterRad] and all samples, drawings, models, designs and other information which [Aquilant] has received from [InterRad] or has created for InterRad or its customers; (ii) [Aquilant] shall immediately discontinue use of any and all trade names, trademarks, labels, copyrights, customer lists and advertising media belonging to [InterRad] or, supplied to [Aquilant] by [InterRad]; and (iii) at the option of [InterRad], cease contacting current or prospective customers concerning the sale of the Products or [InterRad] or make appropriate introductions for any of [Aquilant's] successors; (iv) [Aquilant] shall provide a current customer list including contact information, to help assure a uninterrupted transition.

ECF No. 28 § 19(a).[4]  None of these provisions explicitly prohibit Aquilant from selling SecurAcath post-termination.  Nor does § 19(a), or any other provision in the Agreement, expressly dictate what Aquilant must do with its remaining inventory of SecurAcath.[5]

InterRad argues that the Agreement's failure to include an express term prohibiting post-termination sales "is immaterial when the Agreement explicitly precludes the means necessary to accomplish such sales."  ECF No. 43 at 2.  Under Minnesota law, courts interpret contracts as a whole, *Burke v. Fine*, 608 N.W.2d 909, 911 (Minn. Ct. App. 2000), and sometimes recognize implied contract terms that necessarily result from the contract language or are indispensable to carrying out the parties' intent, *Advantage Consulting Grp., Ltd. v. ADT Sec. Sys., Inc.*, 306 F.3d 582, 587 (8th Cir. 2002) (applying Minnesota law).  Post-termination obligations in § 19(a), including Aquilant's obligation to return marketing materials, cease using InterRad's trademarks, and provide its customer list "to help assure a uninterrupted transition," ECF No. 28 § 19(a), are inconsistent with Aquilant continuing to sell SecurAcath.  In particular, it is hard to understand how Aquilant could

---

[4]     Other provisions in the Agreement survive its termination: "Notwithstanding the termination of this Agreement, the parties shall be required to carry out all provisions of this Agreement which contemplate performance subsequent to such termination[.]"  ECF No. § 19(b).  And "[a]ll of the provisions of Sections 8-20 and 22 shall survive the expiration or termination of this Agreement."  ECF No. 28 § 21.  InterRad does not point to any specific provision outside of § 19(a) that prohibits Aquilant from selling SecurAcath after the termination of the Agreement.  *See generally*, ECF No. 25.

[5]     Upon termination, some distribution agreements provide the supplier with an option to repurchase the distributor's remaining inventory or give the distributor a limited window of time to liquidate its inventory.  *See, e.g.*, *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 CIV. 4746 (DLC), 2008 WL 4410130, at *2 (S.D.N.Y. Sept. 26, 2008).  Neither type of provision is included in the Agreement.

comply with its obligation to "cease contacting current or prospective customers concerning the sale of [SecurAcath]" while continuing to sell SecurAcath.

However, courts are reluctant to read terms into a contract to effectuate the parties' unexpressed intent. *Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 395 (Minn. 1998) (citing *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 215 N.W.2d 473, 476 (Minn. 1974)). And "the expression of specific things in a contract implies the exclusion of all not expressed." *Am. Nat. Bank of Minn. v. Hous. & Redevelopment Auth. for City of Brainerd*, 773 N.W.2d 333, 338 (Minn. Ct. App. 2009) (quoting *Maher v. All Nation Ins. Co.*, 340 N.W.2d 675, 680 (Minn. Ct. App. 1983)). Here, § 19(a) lists Aquilant's post-termination obligations, but does not include a term requiring Aquilant to cease selling SecurAcath. Moreover, § 3(b) requires Aquilant to "cease marketing or selling" any product that InterRad discontinues. ECF No. 28 § 3(b). The express contractual term requiring Aquilant to cease selling SecurAcath in § 3(b), contrasted with the absence of such an express term listed as a part of Aquilant's post-termination obligations, strongly indicates the parties could have, but chose not to, impose such a requirement. *Cf. First Nat'l Bank v. Am. Lenders Facilities, Inc.*, No. 00-cv-269 (JRT/RLE), 2002 WL 31163123, at *6 (D. Minn. Sept. 23, 2002).

Nor is it persuasive that Aquilant's obligation to "discontinue use of any and all . . . trademarks," ECF No. 28 § 19(a)(ii), encompasses an obligation to stop selling its remaining inventory of SecurAcath. A trademark is "[a] name, symbol, or other device identifying a product or service." The American Heritage Dictionary of the English Language 861 (5th. ed. 2012). The product—SecurAcath—is distinct from the marks used

to identify that product.  Interpreting § 19(a)(ii) to prohibit Aquilant from selling SecurAcath would be inconsistent with the plain-language definition of trademark.  And because contracts should be examined as a whole, *Burke*, 608 N.W.2d at 911, § 19(a)(ii) must be considered in the context of § 10, the provision governing Aquilant's use of InterRad's trademarks.  Section 10 allowed Aquilant to "use the Trademarks in the Territory solely in connection with the sale of the Products."  ECF No. 28 § 10(a).  By allowing Aquilant to use the marks "in connection with the sale of the Products," the Agreement does not seem to contemplate the sale of SecurAcath as a use of the marks.  And upon termination, Aquilant "shall cease from use of the Trademarks and shall destroy and/or return . . . all documents, instructions, stationery, advertisements, display items, pamphlets, sales literature, signs and the like bearing any of the Trademarks." *Id.* § 10(b).  The parties could have, but did not, include SecurAcath in that list.  Because § 10(b) does not require Aquilant to return SecurAcath or cease sales of product bearing InterRad's marks, interpreting § 19(a)(ii) to include such a requirement would be inconsistent with the text of § 10.

InterRad also turns to trademark law, relying on the proposition that when a license is silent about liquidating inventory, the licensee has no right to sell its remaining inventory after the license is terminated.  *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 385 (S.D.N.Y. 2000) ("[I]f a licensee could sell inventory manufactured during the term of the license over an indefinite period after its termination or expiration, the expiration date would have little force or meaning."); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 25:31 (5th ed. Dec. 2023 Update) (same); *Bill Blass, Ltd. v. SAZ*

*Corp.*, 751 F.2d 152, 155 (3d Cir. 1984) ("The far more reasonable construction is that the licensee under the Men's License undertook the risk that if it kept its inventory at too high a level the inventory might not be sold by the expiration date of the license.").

But those cases involve a claim for trademark infringement under a license agreement.  For example, in *Bill Blass*, the plaintiff granted the defendant an exclusive right to use the "Bill Blass name and marks in connection with the manufacture and sale of menswear."  *Bill Blass*, 751 F.2d at 153.  As a licensee, the defendant's rights to manufacture and sell products bearing plaintiff's marks depended upon the terms of the contract.  *Id.* at 155.  Because the license was silent on liquidation of existing inventory, the court concluded the defendant's license ended, and therefore the sale of any clothing bearing plaintiff's marks was trademark infringement.  *Id.*  By contrast, InterRad brings a breach-of-contract claim.  To prevail, InterRad must identify the contractual provision that Aquilant breached (and is continuing to breach) by selling its remaining inventory of SecurAcath.  *Cf. Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 757 (8th Cir. 2021) (affirming dismissal when plaintiff failed to identify the contractual provision purportedly breached).  Moreover, although a license agreement may be incorporated into a distribution agreement—as is the case here—the concepts are distinct.  *See, e.g.*, Corporate Counsel's Guide to International Distribution & Licensing § 1:1 (July 2022 Update) ("The distribution agreement should establish the parameters of the parties' relationship and obligations to one another . . . .  The license agreement will need to grant to the distributor a license to use the various intellectual properties needed to market the

products.").  InterRad's license-agreement cases involving trademark-infringement claims are not persuasive here.

"The party requesting injunctive relief bears the 'complete burden' of proving that an injunction should be granted."  *Ness v. City of Bloomington*, 437 F. Supp. 3d 714, 722 (D. Minn. 2020) (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)).  InterRad has failed to demonstrate that the Agreement prohibits Aquilant from selling SecurAcath.  At best, the Agreement is ambiguous.  But InterRad has not put forward any external evidence of the parties' intent.  *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018) ("If the district court determines that a contract is ambiguous, it may admit parol, or extrinsic, evidence of the parties' intent."); *Fredrich v. Indep. Sch. Dist. No. 720*, 465 N.W.2d 692, 695 (Minn. Ct. App. 1991).  Though the question is not free of doubt, the better answer is that InterRad has not met its burden at this preliminary stage to show it is likely to prevail on the merits of this breach-of-contract theory.[6]

(b) InterRad also brings a breach-of-contract claim under § 19(a)(iii).  Am. Compl. ¶ 80.  Section 19(a)(iii) states that "at the option of [InterRad], [Aquilant shall] cease contacting current or prospective customers concerning the sale of the Products or [InterRad] or make appropriate introductions for any of [Aquilant's] successors."  ECF No. 28 § 19(a)(iii).  Aquilant does not dispute that it has continued contacting customers to sell SecurAcath.  *See generally*, ECF No. 31.  However, it contends this provision is

---

[6]     The only evidence in the record regarding Aquilant's breach of § 19(a)(ii) is Aquilant's sale of SecurAcath bearing InterRad's marks.

disjunctive. *Id.* at 33 ("[T]he Distribution Agreement requires that Aquilant *either* cease contacting customers *or* make appropriate introductions for the new distributor.").

Although "or" is normally interpreted as disjunctive to indicate an alternative, *Quality Pork Processors, Inc. v. Am. Home Assur. Co.*, No. A10-1443, 2011 WL 1364433, at *2 (Minn. Ct. App. Apr. 12, 2011), it is often read as conjunctive depending on the context, *Broadway Child Care Ctr., Inc. v. Minn. Dep't of Hum. Servs.*, 955 N.W.2d 626, 634 (Minn. Ct. App. 2021); *see also Smith v. United Television, Inc. Special Severance Plan*, 474 F.3d 1033, 1037 (8th Cir. 2007) ("[C]ourts have recognized the principle of contract interpretation that the terms 'and' and 'or' may be interchanged, in context, to carry out the parties' intent and the agreement's purpose."). Here, it is reasonable to read Aquilant's § 19(a)(iii) obligations as alternatives. Section 19(a)(iii) starts with the phrase "at the option of InterRad." ECF No. 28 § 19(a)(iii). Because option means "something available as a choice," The American Heritage Dictionary of the English Language 589 (5th ed. 2012), it makes sense to read this introductory phrase as giving InterRad the option to select between two alternative obligations. And Aquilant could not simultaneously cease contacting its SecurAcath customers and make appropriate introductions for Vygon. This incompatibility supports the conclusion that InterRad's choice is disjunctive. If Aquilant is correct, then InterRad has failed to elect which of the two obligations Aquilant is required to perform. *See* ECF No. 30 at 8 ¶¶ 5–6 (requesting an injunction to enforce both obligations); Restatement (First) of Contracts § 325 (1932). Without any argument from InterRad directed specifically at this issue, *see generally* ECF No. 43, it has failed to show it is likely to prevail on a breach-of-contract claim under § 19(a)(iii).

20

(c) InterRad also brings a breach-of-contract claim based on Aquilant's failure to provide a customer list.  Am. Compl. ¶ 80.  There is no dispute that § 19(a)(iv) requires Aquilant to "provide a current customer list including contact information," ECF No. 28 § 19(a), and Aquilant concedes it has not provided a customer list to InterRad, ECF No 31 at 22.  But Aquilant contends that it "may not provide InterRad with Aquilant's UK customers' personal information . . . under the UK's data privacy legislation." *Id.* at 33.  Because Aquilant raises this issue in its section on the merits, ECF No. 31 at 24–33, it seems to be raising an impossibility or impracticability affirmative defense.

"Minnesota law recognizes the defense of impossibility, or impracticability, which can excuse performance under the terms of a contract." *Aspenwood Condo. of Duluth, Inc. v. PMA Cos.*, No. A21-0719, 2022 WL 433241, at *2 (Minn. Ct. App. Feb. 14, 2022).  Minnesota courts explain the defenses as follows:

> [D]ue to the existence of a fact or circumstance of which the promisor at the time of the making of the contract neither knew nor had reason to know, performance becomes impossible, or becomes impracticable in the sense that performance would cast upon the promisor an excessive or unreasonably burdensome hardship, loss, expense, or injury.

*Id.* (quoting *Powers v. Siats*, 70 N.W.2d 344, 348 (Minn. 1955)).  A party's performance under a contract may be made impracticable by a conflicting domestic or foreign law. *Hansmeier v. Seaver*, 622 B.R. 720, 724–25 (D. Minn. 2020) (applying Minnesota law); *Microsoft Corp. v. Ion Techs. Corp.*, 484 F. Supp. 2d 955, 961 (D. Minn. 2007); *Vill. of Minneota v. Fairbanks, Morse & Co.*, 31 N.W.2d 920, 925 (Minn. 1948).  "The regulation or order must directly affect a party's performance in such a way that it is impracticable

for him both to comply with the regulation or order and to perform." Restatement (Second) of Contracts § 264(b) (1981).

When a defendant raises an affirmative defense in opposition to a preliminary injunction, the defendant bears the burden to show its likelihood of success because "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). David Boland, the Director of Aquilant, states in his declaration: "It is my understanding that, under the UK GDPR, Aquilant cannot send personal information, including names and business contact information, of individuals in the UK to someone in the United States without specific requirements being met." ECF No. 36 ¶ 21. This seems correct for individuals. *See*, Data Protection Act 2018, c. 12, § 73 https://www.legislation.gov.uk/ukpga/2018/12/section/73. However, entities, not individuals, purchase SecurAcath from Aquilant. *See, e.g.*, ECF No. 27 ¶ 35. And the United Kingdom's Data Protection Act does not seem to protect the names, addresses, or contact information for entities. *See* Data Protection Act 2018, c. 12, § 3, https://www.legislation.gov.uk/ukpga/2018/12/section/3.[7] Because Aquilant has not shown it is likely to prevail on its impracticability defense, InterRad will likely prevail on its customer-list based breach-of-contract claim under § 19(a)(iv).

---

[7] To the extent Aquilant is prohibited from providing the contact information of individuals working for its customers, Aquilant has not explained why it is not "still practicable for [Aquilant] to render performance that is substantial." Restatement (Second) of Contracts § 270 (1981) (discussing partial impracticability).

(d) Finally, InterRad brings a breach-of-contract claim based on Aquilant's failure to return confidential information under § 19(a)(i).  Am. Compl. ¶ 80.  Section 19(a)(i) states that Aquilant "shall return to [InterRad] . . . all Confidential Information and all materials given to [Aquilant] by or on behalf of [InterRad] and all samples, drawings, models, designs and other information."  ECF No. 28 § 19(a)(i).  In Goldberger's declaration, he states that "Aquilant has not returned to InterRad all samples, drawings, models, designs and other information which Aquilant received from InterRad or created for InterRad or its customers."  ECF No. 27 ¶ 33.  Aquilant does not seem to dispute this. *See generally* ECF No. 31.  Therefore, InterRad is likely to prevail on its breach-of-contract claim under § 19(a)(i).

## B

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC* 563 F.3d 312, 319 (8th Cir. 2009).  The harm must be "*likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, "great[,] and of such imminence that there is a clear and present need for equitable relief," *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996).  A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury."  *Berkley Risk Adm'rs Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation and internal quotation marks omitted).  "Failure to show irreparable harm is an independently sufficient

ground upon which to deny a preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

(1) InterRad begins by arguing that it "will suffer irreparable harm if Aquilant is allowed to continue its campaign to destroy the market for InterRad's products." ECF No. 25 at 28. Normally, "lost profits and lost business can be readily calculated and redressed through monetary relief." *Cenveo Corp. v. S. Graphic Sys., Inc.*, No. 08-cv-5521 (JRT/AJB), 2009 WL 161210, at *3 (D. Minn. Jan. 22, 2009). However, "[l]ost profits that are difficult to quantify may constitute irreparable harm." *Bison Advisors LLC v. Kessler*, No. 14-cv-3121 (DSD/SER), 2014 WL 5489289, at *4 (D. Minn. Oct. 30, 2014). "The moving party bears the burden of showing lost profits would be difficult to quantify such that money damages would be difficult to ascertain." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 874 (D. Minn. 2015). Even if the amount of financial harm is readily ascertainable, a preliminary injunction may be granted "when the potential economic loss is so great as to threaten the existence of the moving party's business." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil* § 2948.1 (3d ed. Apr. 2023 Update).

InterRad claims "the harm to InterRad's viability and business would be as immeasurable as it would be irreparable," ECF No. 25 at 29, but the record evidence does not substantiate this assertion. The NHS Supply Chain discontinuing access to SecurAcath "has been a significant detriment to InterRad," ECF No. 27 ¶¶ 36, 38, Vygon is not "seeing the expected volume of orders on a direct basis," ECF No. 28-14 at 2, and "Aquilant's ongoing conduct" is causing "issues with InterRad's suppliers, InterRad's new distributor,

24

and with customers," ECF No. 27 ¶ 34.  Neither this evidence nor other record evidence demonstrates that InterRad and Vygon's lost business is uniquely difficult to quantify.  *See, e.g.*, 28-15 at 2 (an email from InterRad's CEO stating: "Once this matter is resolved, we will mutually determine and amend the forecast to subtract sales directly lost due to the disruption from HC21/Aquilant.").  This evidence does not demonstrate that Aquilant's continued sales of SecurAcath pose an existential threat to InterRad's business.

InterRad relies on *Bulova Corp. v. Bulova Do Brasil Com. Rep. Imp. & Exp. Ltda.*, for the proposition that threats to destroy the market can constitute irreparable harm.  144 F. Supp. 2d 1329, 1332 (S.D. Fla. 2001).  But in *Bulova Corp.*, the defendant "threatened to flood the Brazilian market with Bulova watches at very low prices to destroy the value of the Bulova brand."  *Id.* at 1330.  By contrast, Aquilant attempted to bulk sell its inventory "at a discount," but "above Aquilant's total cost for the inventory to be sold."  ECF No. 38 ¶ 11.  And despite an initial attempt to sell SecurAcath in bulk, it now seems to be selling SecurAcath "at a discount . . . just as and when the product is required."  ECF No. 28-14 at 4.  So not only has InterRad failed to demonstrate that Aquilant is likely to flood the market with SecurAcath, but Aquilant's discounted sales do not seem comparable to the sale of Bulova watches at such low prices as to destroy the brand.  In other words, although the destruction of InterRad's United Kingdom market could be irreparable harm, InterRad has not shown that harm is likely absent an injunction.

(2) InterRad next contends it will suffer irreparable harm to its reputation and the goodwill of its products.  ECF No. 25 at 30.  The Eighth Circuit has long recognized that "potential loss of consumer goodwill qualifies as irreparable harm."  *Iowa Utils. Bd.*, 109

F.3d at 426; *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars."). However, "courts 'may choose to require more than a loss of goodwill to demonstrate irreparable harm,' and, with respect to the loss of goodwill itself, may also determine 'whether an alleged harm requires more substantial proof.'" *Mainstream Fashions Franchising, Inc. v. All These Things, LLC*, 453 F. Supp. 3d 1167, 1202 (D. Minn. 2020) (quoting *Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 790 (8th Cir. 2010)). And there are times where harm to reputation and goodwill can be remedied by money damages. *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013).

InterRad's loss of control over its marks could be irreparable harm; lost control often poses a substantial threat of injury to the trademark owner's reputation and goodwill built on the brand. *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 845–46 (D. Minn. 2011). For example, courts have found that a former franchisee's sale of unapproved goods under the franchisor's trademark, *Tim Hortons USA, Inc. v. Tims Milner LLC*, No. 18-CV-24152, 2019 WL 2515006, at *5 (S.D. Fla. June 17, 2019), and a former distributor's sale of outdated military equipment, *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 CIV. 4746 (DLC), 2008 WL 4410130, at *8 (S.D.N.Y. Sept. 26, 2008), would likely result in harm to intangible assets that could not be compensated with monetary damages. But InterRad does not claim (or demonstrate) that Aquilant is selling expired product, outdated product, or altered product. Nor has InterRad identified any specific conduct by Aquilant that would tarnish the SecurAcath brand other than Aquilant's continued sale of its inventory.

Instead, InterRad relies on evidence of confusion in the marketplace.  *See* ECF No. 27 ¶¶ 39–41; ECF No. 28-11 (email from the Wales branch of the National Health Service); ECF No. 28-12 (email chain from the Clatterbridge Cancer Centre NHS Foundation Trust).  Although "a finding that likelihood of confusion exists results in a presumption that a threat of irreparable harm exists" in a trademark case, *Warner Bros. Ent. v. X One X Prods.*, 840 F.3d 971, 982 (8th Cir. 2016), this is a breach-of-contract case to which that presumption does not apply.  Without that presumption, confusion is relevant in conjunction with a loss of control.  *Buffalo Wild Wings*, 829 F. Supp. 2d at 845–46.  But as was previously discussed, InterRad has not adequately connected its loss of control here with likely harm to its reputation or goodwill.  And InterRad otherwise fails to explain how confusion in the marketplace—as to the authorized distributor of SecurAcath—will likely damage its reputation or goodwill absent an injunction.  The better answer is that InterRad must demonstrate likely harm to its intangible assets by more substantial proof.  *See Gen. Motors Corp.*, 563 F.3d at 320.

(3) InterRad also claims that its relationships with its suppliers and subsequent distributor (Vygon) will be irreparably harmed absent an injunction.  ECF No. 25 at 32–34.  Courts have found irreparable harm when an obligor's refusal to abide by its contractual obligations will impair the obligee's relationships.  *Perdue Premium Meat Co. v. Mo. Prime Beef Packers, LLC*, No. 6:22-CV-03009-MDH, 2022 WL 193217, at *4 (W.D. Mo. Jan. 20, 2022) (finding that a third party's refusal to process grass-fed cattle would result in a ranch being unable to fulfill its obligation to provide finished meat products to customers); *Borgwarner PDS (Anderson), L.L.C. v. Indus. Molding Corp.*, No.

20-10607, 2020 WL 1169405, at *1, *6 (E.D. Mich. Mar. 11, 2020) (finding that without a continued supply of parts, plaintiff's production lines would soon grind to a halt, leaving plaintiff unable to supply automotive products to a car manufacturer); *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 622 (S.D.N.Y. 2010) (finding that plaintiff would suffer irreparable harm if the sole distributor stopped selling plaintiff's medical device).

There is some evidence in the record about InterRad's relationship with suppliers. "InterRad has long term contracts with two manufacturers and material suppliers." ECF No. 27 ¶ 6. Aquilant's cancellation of orders and competition with Vygon "has caused InterRad to miss its minimum purchase obligations with certain suppliers." *Id.* ¶ 7. InterRad's relationship with its suppliers is particularly important because of the limited number of suppliers capable of serving InterRad's needs. *Id.* ¶ 8. And "Aquilant's ongoing conduct has caused and is continuing to cause issues with InterRad's suppliers." *Id.* ¶ 34.

The types of irreparable harm found in *Perdue*, *Borgwarner*, and *Rex Medical* are not readily apparent here. Because customers are continuing to receive SecurAcath, the risk of permanent market loss as customers turn to substitute products is not presented here. And InterRad has not shown its suppliers' production lines will soon grind to a halt or that it will imminently be unable to satisfy its contractual obligations absent an injunction. Although InterRad missed certain minimum-purchase obligations in 2023, *see* ECF No. 27 ¶ 7, there is insufficient evidence in the record to conclude it will likely be forced to breach those minimum-purchase obligations with suppliers again absent an injunction. Moreover, the causal chain here is more attenuated than in the typical supply-chain case. A distributor

is not refusing to distribute product, nor is a supplier refusing to supply it.  Instead, InterRad claims Aquilant's sales are driving down Vygon's sales, reducing InterRad's sales to Vygon and making InterRad's sales projections less certain.  Without more substantial proof, InterRad has not made "a clear showing of immediate irreparable injury." *Berkley Risk Adm'rs*, 2016 WL 4472943, at *4 (citation and internal quotation marks omitted).  Rather, its chief complaint appears to be lost business compensable with money damages.[8]

## C

The balance-of-harms factor involves "assess[ing] the harm the movant would suffer absent an injunction," as well as the harm the other parties "would experience if the injunction issued." *Katch*, 143 F. Supp. 3d at 875.  This factor doesn't change anything.  Aquilant's continued sale of SecurAcath will harm InterRad's business, perhaps substantially so.  But an injunction would likely lead to a total loss of Aquilant's remaining inventory, in the amount of "approximately $2.6 million."  ECF No. 36 ¶ 20.  In other words, Aquilant would be substantially harmed by an injunction, and InterRad will be substantially harmed without an injunction.  Aquilant could be compensated by a bond, while InterRad can be compensated with monetary damages.

## D

The public interest favors enforcing contracts.  *Menzies Aviation (USA), Inc. v. Wilcox*, 978 F. Supp. 2d 983, 1001 (D. Minn. 2013).  And here Aquilant has failed to abide

---

[8]    To be clear, any delay in bringing its motion for a preliminary injunction has not been weighed against InterRad.  *See, e.g.*, *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002).

by some of its contractual obligations.  But the most consequential injunction InterRad seeks is to prohibit Aquilant from selling its remaining inventory of SecurAcath.  And it has not demonstrated that Aquilant is obligated to cease selling SecurAcath under the Agreement.  The parties' remaining public-interest arguments are not persuasive in a way that might change the outcome.

*

InterRad's primary objective in seeking a preliminary injunction was to prevent Aquilant "from continuing to sell InterRad products while this matter is resolved on the merits." ECF No. 25 at 36.  As analyzed above, InterRad has not shown that it is likely to prevail on the merits of its breach-of-contract claim, nor has it shown irreparable harm specific to this issue.  Primarily for these reasons, InterRad's motion will be denied. Though InterRad has shown a likelihood of success as to its breach-of-contract claim seeking a customer list, it did not seek this relief in its proposed order.  *See* ECF No. 30 at 7–8.  Regardless, InterRad did not show a likelihood of irreparable harm flowing specifically from this breach or arising from Aquilant's failure to return confidential information under § 19(a)(i).  For these reasons, it would not be appropriate to enter a preliminary injunction directed at these particular issues.

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff InterRad Medical Inc.'s Motion for a Preliminary Injunction [ECF No. 23] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 4, 2024       s/ Eric C. Tostrud
               Eric C. Tostrud
               United States District Court